Carl Duma and Jan Duma, I would like to please reserve three minutes for rebuttal. The district court here did at summary judgment what Rule 56 forbids. It weighed evidence and chose between competing inferences on intent, reliance, and accrual. In its own order, the court acknowledged disputes of fact. The summary judgment record here permitted a reasonable jury to find that Meineke induced CJGL to sign an eight-year renewal while concealing that it would never guarantee the lease that CJGL needed to keep its location. Counsel, let me ask you about that in particular. Can you tell me where and when in the record it shows that Meineke made intentionally fraudulent statements? In Ms. Duma's declaration, I believe in the evidence at large, including the e-mails, would lead Ms. Duma to believe reasonably that Meineke would be signing the guarantee. Indeed, that's what the jury found ultimately in finding that Meineke was equitably stopped to enforce the franchise agreement because of its own fraud. So that's what the jury ultimately found in this case, that Meineke did commit fraud. So the e-mails and Ms. Duma's declaration? Yes. Preliminarily, I want to address the waiver issue raised by respondents, that my clients purportedly waived their right to appeal by entering into a stipulated judgment. The court ordered the parties— This is at summary judgment, right? They're arguing waiver of the right to appeal the summary judgment motion. Correct, Your Honor. Okay. So just very briefly, we did not waive any right to appeal. The court ordered the parties to lodge a proposed judgment. We complied with the court's order. The judgment on its face states that it was entered pursuant to the court's summary judgment order. My clients opposed summary judgment on the merits and lost. There is no settlement here, no voluntary dismissal, no surrender of any claims, which are the hallmarks of the waiver cases. So there is clearly no waiver here. We are simply complying with the court's order after we lost on the merits of summary judgment. Secondly, I want to address another claim by respondents that—regarding the record on appeal. We agree without reservation that review is confined to the summary judgment record, and our argument stands on that record. The summary judgment record included Jan Duma's declaration, Robinson's repeated emails, the landlord's June 7, 2021 email stating that Meineke, quote, has agreed to guarantee the lease, end quote. Meineke's subsequent email in September 24th, which is after my client signed the extension for the franchise agreement, that, quote, Meineke was now exiting the business of guaranteeing leases. The verdict that we referred to in our briefs, and which I just referred to right now, the jury verdict, where the jury ultimately found that Meineke engaged in fraud. Again, this is for framing purposes only. It confirms that there indeed were genuine issues of dispute regarding Meineke's fraud, which the jury found. But I want to make clear that on the record itself, there were triable issues of fact. I don't have the time to address every single counterclaim raised. I want to focus on the fraud counterclaims, and specifically fraudulent inducement, which presented classic jury questions. Again, the legal standard here favors trial, not summary judgment. I'll quote from the Tenzer case. The California Supreme Court stated that fraudulent intent, quote, must often be established by circumstantial evidence, end quote. Then the California Supreme Court in Lazar again stated that fraudulent intent may be inferred from the entire course of conduct. And then the Ninth Circuit in the Kalanetics case states that where motive or intent is the key contested issue, the plaintiff, quote, should have an opportunity to let the jury draw its own inferences from the undisputed facts unless all reasonable inferences that could be drawn defeat the plaintiff's claims. And that simply was just not our case here, and summary judgment should not have been granted, and the chronology of events bears this out. May 8th and 13th in 2021, Mr. Robinson of Meineke commits his best to get CJGL a master lease to match our eight-year franchise trade market agreement, and he confirms that he did contact the landlord. And here is the key to me. June 7th, 2021, the landlord tells Mr. Robinson of Meineke in writing that it will lease directly to CJGL, quote, as Meineke Corporate has agreed to guarantee the lease, end quote. So clearly the landlord is under the impression, so it's not just my client, but the landlord is putting this in writing, the landlord is under the impression that Meineke Corporate has agreed to guarantee the lease. Was there any more information other than the landlord saying that? Like, did he say, you know, Bob Smith at Meineke said that they would guarantee the lease? Is there any evidence in the record that says that someone at Meineke agreed to guarantee the lease? I don't recall in the record offhand if there's further evidence, but I will say this evidence is pretty strong. It's in writing, and it's coming from the landlord. And critically, maybe most critically, Meineke never corrects that understanding, not then and not ever before renewal. Meineke never says, replies to that email. Mr. Robinson never replies to that email. Hey, landlord, you are totally mistaken. Meineke is not guaranteeing the lease. That's what Meineke should have done. That's what I would have done. That's what any reasonable person who's not engaging in fraudulent concealment should do, is respond to that type of statement by saying, you are mistaken. Meineke is not guaranteeing the lease, period. Ms. Duma and the landlord, you can do what you choose. If the landlord is insisting that Meineke guarantee the lease, I'm sorry. Meineke is not guaranteeing the lease, so you guys can alter your negotiations, do whatever you want to do. But that would paint a clear picture of Meineke's intent. Counsel, do you have any evidence in the record that would explain to us that at the time that that promise was allegedly made, Meineke had no intent to actually follow through with it? Again, the reason why I started quoting the cases is because it's difficult in fraudulent intent cases to prove fraudulent intent. Unless Meineke wants to get on the stand and admit, like Colonel Nathan Jessup did in A Few Good Men, yes, I admit, I engaged in fraud. I mean, I'm not that good of an attorney to do that, but the reason why the courts always say that you can infer fraudulent intent based on the party's course of conduct, et cetera, is precisely that. Unless, you know, I can get Nathan Jessup to make that concession, it's just not going to happen. I'm trying to understand how the facts, or what was before the court in summary judgment that, or what wasn't before the court in summary judgment that came out at the trial that led to, you know, the different result. Right, and I didn't lodge the entire trial transcript because, again, like I pointed out at the beginning, I want to make clear that I'm relying strictly on the record that was before the court on summary judgment, which our contention is that that created tribal issues of material fact. And, you know, again, I didn't put this in the record. It's not necessary, but Ms. Duma is not going to contradict her own testimony at trial and say, no, Meineke was up front with me all along about, that they wouldn't guarantee the lease. I mean, that's just not what happened. In any event, it's not, her declaration was before the court on summary judgment. Meineke's, I mean, the landlord's critical June 7, 2021 email, where the landlord was clearly under the impression that Meineke corporate, quote, has agreed to guarantee the lease, end quote, was before the court. And like I said, you know, there's repeated law in the California Supreme Court, the Ninth Circuit, that, you know, unless all reasonable inferences simply defeat the plaintiff's claim, summary judgment isn't appropriate. You know, just continuing on to my timeline, and I'll try to wrap this up quickly, is that it didn't stop at that critical June 7, 2021 email, where the landlord stated that Meineke corporate has agreed to guarantee the lease. I mean, not only did Meineke never correct that misunderstanding, never say to the landlord or to my clients. So, okay, what would be the incentive for Meineke not to correct the landlord? To do precisely what they did, which is to have Ms. Duma sign the extension and to trap her. She was trapped. And then subsequently on, Meineke insisted that her husband also sign, and they were trapped in no man's land. They're operating this Meineke franchise location. They don't have premises. The premises, and there's just, there's nothing to, they're at, unless they're going to file for bankruptcy, it's, you know, let's try to get through this as best we can. And at that point, they were still operating the franchise. It wasn't until the summer or late 2022 when the landlord, you know, put the premises up for lease. And then the writing is on the wall, and that's when damage accrues. But, you know, even the additional facts going back to my chronology or after that June 7, 2021 email, in late June 2021, Ms. Duma asked Meineke, hey, can I please have a brief 30-day extension to sign? Meineke refuses that. Ms. Duma then asked in an email, quote, what happens if I sign the franchise agreement, and Meineke decides not to guarantee the lease? Mr. Robinson doesn't answer, and his answer is very misleading, and a jury can interpret it as such when he says, one down, one to go. So, again, there's no correction. There's no affirmative statement by Mr. Robinson or anyone from Meineke stating, we're not guaranteeing the lease. This is not going to happen. So I suggest you, you know, don't sign the renewal, or you're going to have to work out some deal with the landlord where the landlord acquiesces in its demand that Meineke guarantee the lease. Do we do anything with the fact that the Dumases were counsel, that they were also attorneys? No, it's irrelevant. I mean, I don't know if this is in the record, but I mean, you know, Mr. Duma is not in a well-held state to make these types of decisions. Ms. Duma is elderly as well, and not, you know, I guess the answer is no. Let me ask you, there's several of your counterclaims that your friend on the other side argues are barred by the statute of limitation because something was suspicious about this, and you were on inquiry notice that something was suspicious. And I honestly, I mean, the activity here, I mean, I'm perplexed, like how things weren't clear, you know. I'm perplexed as well. If the question is, well, when did this, what's my response to the statute of limitations argument? It's what I just brought up a moment ago, is that there is no appreciable actual harm sustained until August 2022 or September 2022 when the landlord abruptly puts the premises up for lease. And so imagine if you're my clients, you're operating a Meineke franchise location. Even though there's problems going on behind the scenes, I'm sure there's problems in many franchise type relationships, there's no significant harm, there's no real harm until one day the landlord puts out a for lease sign in front of your franchise premises. And then that's when the writing is on the wall. That's when customers stop coming. I mean, that's when the damage occurs. Up until that time, there's still negotiations that are happening. There's no sustainable damage. I'm not sure how much time I have left. Seven minutes. Seven minutes. But you can reserve some. Yes, I would like to reserve some time. I'll sum up. The jury should have been allowed to draw inferences. Also, Meineke didn't announce until September 2021, which is after my client signed the extension agreement. In September 2021, Meineke then announces that it's exiting the business of guaranteeing its franchise leases. Now, a company that's exiting the business of guaranteeing leases in September made that decision sometime before then. A reasonable juror could infer that it was made before July 12th when my client signed the extension agreement. But they were at least thinking about it. They had to have been thinking about it before September. I would think so, 100%. And that might be why they never made an affirmative statement either way. Well, they should have been under a duty to say something to the effect of, you know, Mr. Landlord, in response to your email that Meineke Corporate has agreed to guarantee the lease, Mr. Landlord and Ms. Duma, by the way, that is incorrect. We are not guaranteeing the lease. And then Meineke could either say, if the decision had truly been made by then, no, we're not guaranteeing the lease, or if a decision hadn't firmly been made, but it's out there, no, Mr. Landlord, no, Ms. Duma, just so we're clear, Meineke is still, Meineke might be exiting the business. So there's uncertainty there. And really, I mean, Meineke, if it's operating reasonably, should have granted Ms. Duma the 30-day extension she sought, and then surely by then a firm decision would be made whether or not Meineke is guaranteeing the lease, and Meineke could be forthright with the landlord and Ms. Duma and say, here's our decision, we're not guaranteeing the lease. So do what you want to do with that. Meineke never did that. It led my client to believe that Meineke would be guaranteeing the lease. She signed the extension and then was left literally in no man's land due to Meineke's conduct. The court's own summary judgment order, I mean, proves that there is improper weighing of the facts. The court found a dispute of fact regarding Mr. Robinson's authority and his representations, and the court acknowledged, quote, the party's dispute, the extent to which these representations induced the Dumas, end quote. And these are at footnotes 7 and 10 of the court's summary judgment order. And the problem is, though, is that the court resolved these factual issues and matters of Meineke's intent as a matter of law on summary judgment. That's the problem. And the law is clear, which I recited before, and there's also a Supreme Court case, Anderson v. Liberty Lobby, 477. U.S. 242 at page 255, et cetera, that choosing between competing reasonable interpretations, that's the jury's function, not the court's function on summary judgment. And again, the jury in this case ultimately found that Meineke was equitably a stop from enforcing its own trademark agreements because of its fraud. And so the jury in our case should have decided my client's counterclaims along with that issue, unless the court has further questions, I'd like to reserve the remainder of my time for a rebuttal, please. All right, thank you, counsel. May it please the court, Lawrence Hilton of One LLP for the appellee's Meineke franchise SPV LLC in Meineke Realty. I'll be brief. I'll start with the waiver issue. In the briefing, the appellants cite authority for an important distinction in this case, and it's the distinction between agreeing to a judgment and the form of a judgment. The appellants understand that's a very important distinction. They devote a significant portion of their brief to that issue, and it is a very important distinction. But what this panel needs to look at is only what the appellants agreed to. They specifically agreed in the stipulation they signed and submitted to the court that they were agreeing to the judgment. They were represented by capable counsel, and as the panel has pointed out, both of the doomers are licensed California attorneys. If the appellants intended only to agree to the form of the judgment, then they could and should have said that. And they didn't. The stipulation that they signed and filed with the court said that they agreed to the judgment. And that's really all the panel needs to know. I won't spend any more time on that because I think on the merits, my client's position on the merits is very strong. And while we certainly believe that there's a waiver issue here, it's really the absence of anything in the record that would support the appellant's position that's important. That is, Your Honors, appellants can point to nothing that they submitted at the time of summary judgment that would lead the court to believe that they were triable issues of fact. In fact, what the appellants have done in their brief and in this argument is repeatedly refer to a verdict on an affirmative defense of collateral or equitable estoppel that very specifically refers to a conversation that Mrs. Duman testified about that she said happened on September 29th of 2021. That's the basis for the jury's verdict. There is nowhere in the record that that evidence was ever presented at the time of summary judgment. If it was so important that the appellants rely on it so heavily, it was incumbent on the appellants to present that evidence at the time of summary judgment, and it was incumbent on appellants in this courtroom to show the panel where that evidence existed in the summary judgment record. It's not there. Mrs. Duman's declaration says nothing about a conversation on September 29th. What Mrs. Duman said was that Joe Robinson, the renewal manager from Ineke, told her, if you're not going to sign the renewal documents, we won't help you get a new lease. That's what Mr. Robinson said. That states nothing other than the obvious, which is that if the Dumas were not going to renew, then it made no sense. There was no reason for Ineke to go get them a lease. And the Dumas... I'm going to pass these to your friend on the other side who kept mentioning the fact that the landlord made that statement that Ineke said it would guarantee the lease. What are we to do with that? Well, I think your point was a good one. There's nothing in the record that indicates that Ineke ever said that it would guarantee the lease. Is there anything in the record that indicates that Ineke said, hey, wait a second, I never said that. Yeah, very important. On September 24th of 2021, the issue of a guarantee was being negotiated by counsel. Meineke had their outside counsel, Mr. Leone. Appellants had their outside counsel, Mr. Half. And on September 24th, Mr. Leone said very clearly to Mr. Half, Meineke is exiting the business of guaranteeing leases. So that was five days before Mrs. Duma signed the agreement on behalf of her husband on September 29th. So clearly Meineke did say that unequivocally before Mrs. Duma signed on September 29th. And if the appellant's position were correct, that when Mrs. Duma executed partially executed the agreement in July of 2021, excuse me, based on the stated belief that Meineke would guarantee the lease, then the clear response that Mrs. Duma would have on September 24th when her lawyer was told Meineke would not be guaranteeing the lease would be to say, hey, whoa, whoa, wait a minute. I signed this agreement in July with the express understanding that you were going to guarantee the lease. Now you've pulled the rug out from under me. Wow, this is a big deal. The landlord clearly was under the assumption that Meineke was going to guarantee the lease. Twice the landlord sent the lease to Meineke asking whether it was ready to execute the guarantee and representing to Meineke that Jan Duma was ready to sign. So the landlord must have had some basis for thinking that. Your Honor, I would agree with that inference, but I have no idea and no evidence was presented at trial or before to explain how the landlord came. But the summary judgment is granted based on the facts and the reasonable inferences that can be drawn from them. And I think it's a reasonable inference to be drawn from that fact that the landlord had a reason to believe that Meineke was again guaranteeing the lease. Hadn't it guaranteed it before? No, it did not. Meineke did not guarantee the lease before. This is a new ask by the landlord. That's correct. The original lease expired in June of 2021. The parties were on a month-to-month tendency after that. So Meineke had never guaranteed that lease. And when was it that Meineke was beginning to think it was going to move its center in the Santa Barbara area? That was after the renewal when the lease negotiations between the Dumas and the landlord were not leading to a lease. Meineke was working with the Dumas to try to find another location. Meineke doesn't like to shut down franchises. In the brief, there are statements in there about Meineke was thwarting the Dumas' efforts to get a lease. It's absurd. There's no universe in which Meineke benefits by its franchisees losing their premises. None. Meineke gets paid a percentage of the revenues that its franchisees generate. So Meineke was trying to do everything it could to get the Dumas another location if they were unsuccessful in getting a lease on their premises in Santa Barbara. I want to ask you to pivot, counsel. So I understand we're not, you know, the evidence that's at trial is not an issue today. But the jury did find Meineke fraudulently induced CJGL into the 2021 franchise agreement. What are we to do with that? I mean, doesn't that support their fraud-based claims? Your Honor, we don't believe that the statement, even if the testimony is believed, that it would support fraud or even the equitable estoppel. We didn't appeal it because, you know, Meineke frankly doesn't like to be in unnecessary litigation with its franchisees. But it had that same, excuse me, had that same evidence been presented at summary judgment, then maybe there might be an argument. So that's a trying to figure out what's the gap, what's the new evidence that came in. Yeah, very significantly. What Joe Robinson said, according to Mrs. Duma, at the summary judgment stage was, hey, you need to sign the renewal or we won't help you get a new lease. What she said at trial was on September 29th of 2021, he pressured me and he told me, if you don't sign the renewal agreement, not only will we not get you a new lease, but we're not going to make the repairs to the premises. That is a completely different issue because as far as obtaining a lease goes, if there's no renewal, it's moot. There's no need for a lease. But the repair issue was going to remain regardless of whether they renewed because that property, and this is in the record, when the Duma's vacated, had very significant environmental problems that went well into the six figures that Meineke had to pay for. So that is a much different statement by Mr. Robinson that he allegedly made. So we think it's very different, fundamentally different. It was the repair issue that crept in. There was a dispute over the repairs. But that wasn't, you're saying that wasn't before the court at summary judgment. That's correct. There was no statement that Mrs. Duma made in her declaration that she was induced to renew based on promises that Meineke would make the repairs. In fact, that was a disputed issue that continued well into September. In fact, just in Mr. Leone's email where he talked about exiting the business of guaranteeing leases, in that exchange, he and the Duma's counsel were going back and forth as to who was responsible. To make those repairs. So that was a disputed issue all the way up until the time that the Duma's renewed. So the summary judgment order says beginning at least in 2018, the parties began to dispute whether CJGL or Realty was the party obligated under the sublease to perform repairs at the premises. So that was in front of the district court at summary judgment. There was a dispute, but there was no evidence at summary judgment that Meineke said, hey, if you renew, we will make the repairs. The record, Your Honor, is that the sublease required the Duma's to make the repairs. The master lease, under the master lease, Meineke agreed to make the repairs and then it delegated that duty to the Duma's under the sublease. That was the nature of the dispute. That dispute was never resolved because vis-a-vis the landlord, Meineke had that obligation, but vis-a-vis Meineke, the Duma's had the obligation. And I just want to point out another fact I think is very important in the record and that is that after the Duma's renewed, Meineke continued to help them try to get a new lease because of course it was in Meineke's best interest for them to do that. But as the trial court noted in the summary judgment order, in December, the Duma's rejected a proposal by the landlord for an eight-year lease and they demanded a 10-year lease. So that's something that the Duma's did. Obviously they have their feelings about Meineke, but that's undisputed in the record that they turned down a lease proposal from the landlord and countered with a 10-year lease demand. Thank you. So unless the panel has further questions, we believe that the trial court properly reached the decision that the appellants have failed to meet their burden of establishing a tribal issue of fact and this court should affirm. Thank you. Thank you, counsel. I would like to touch on a couple of points that respondents counsel just made. Regarding waiver, the Taylor-Brands case is most on point here. And I'll just quote from the case. It's 627 F3rd 874 at page 878. Because Taylor clearly consented to only the form of the judgment insofar as it effectuates the summary judgment order, Taylor has not waived its right to appeal the summary judgment order itself, end quote. That's exactly what we did in this case. We simply consented to the form of the judgment after a disputed hearing on the summary judgment motion. There's certainly no waiver. You contested all the issues. Yes, we contested all the issues. On the summary judgment. You were not, the court decided against you. Yes, we lost. And so you had to then put that in writing. Correct. I don't think that's a serious issue. Thank you, your honor. Regarding the record, again, this is why I kept on repeating myself and I'll do it again here, is that I did not include the trial court record because it is irrelevant and I concede that on the summary judgment motion, the record before your honors is what record was before the court on summary judgment? What record did my trial court predecessor counsel put before the judge on summary judgment? And part of that record are the critical emails. The emails are in the summary judgment record. The emails do not lie. The emails include one from the landlord who is clearly under the impression, as your honor stated, that Meineke had agreed to guarantee the lease. Meineke can argue and dispute those emails and what that truly meant to the jury, but that presents a jury question, not a judicial question to be resolved on summary judgment. So those emails and my client's declaration are part of the summary judgment record. Again, my friend on the other side emphasized that certain things occurred in September 2021. Critically, Meineke had already induced my client, Ms. Duma, to sign before September 2021 she had signed July 12th. Again, based on her assumption, which was shared by the landlord, that Meineke was going to guarantee the lease. So my client had already signed by September 2021. The landlord was clearly under the assumption, as your honor pointed out, that Meineke was going to guarantee the lease in July, which is when my client signed. And there's also, there's no reason for Ms. Duma to take drastic measures of any kind in September 2021 after she had already signed when there's no harm occurring yet. The landlord hasn't terminated the lease. The landlord has not put the premises up for lease. The fact of the matter is, Meineke, the damage had been done in a sense where she had signed, but there's no harm whatsoever. No damage has occurred yet. And again, not to repeat myself, but to repeat myself because I feel it's critical in that oral argument, I want to harp on the critical points, is that June 7th email is a killer for Meineke. It is. The landlord puts in writing that the landlord is under the impression that Meineke is going to guarantee the lease. There is no response to that email by Meineke, no saying the landlord is nuts, no saying that the landlord might be right, might be wrong, because the decision had been made and said it was complete silence on Meineke's part. So my client's belief that Meineke in July was going to guarantee the lease was certainly shared by the landlord, and that's not coming from me. That's coming from the email sent by the landlord that was a part of the record on summary judgment. And I'll conclude by again, quoting from the Ninth Circuit case, the Calnetics case, where motive or intent is the key contested issue, the plaintiff, quote, should have an opportunity to let the jury draw its own inferences from the undisputed facts unless all reasonable inferences that could be drawn defeat the plaintiff's claims. That was not our circumstance here. My client should have had it stay in court before the jury, which ultimately did find that Meineke engaged in fraud, and that's all we're asking that this court do today is allow the jury to decide whether Meineke engaged in fraud. Unless your honors have any other questions, I'll submit. All right, Meineke Franchiser v. CJGL is submitted, and this session of the court is adjourned for today. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, OWENS, ALBA